OPINION
{¶ 1} Appellant, Karen Churchia ("Ms. Churchia"), appeals from the trial court's adoption of the magistrate's decision allowing appellee, Marc Churchia ("Mr. Churchia"), to modify his spousal support obligation due to his loss of employment. The principal issue is whether Mr. Churchia's termination from his employment was an involuntary change of circumstance entitling him to a modification under the relevant statutes. For the reasons herein, the matter is reversed and remanded.
 {¶ 2} The parties were divorced on March 18, 2005. Pursuant to the final judgment entry on divorce, Mr. Churchia was obligated to pay Ms. Churchia spousal *Page 2 
support in the amount of $2,100 per month for a period of seven years. At the time of the divorce, Mr. Churchia was employed at Enrico Products Corporation ("EMI") as a regional sales manager. His spousal support obligation was calculated based upon his annual base salary of $59,865.12, his bonus income of $19,820.27, and Ms. Churchia's income of $16,975.04.
 {¶ 3} On September 28, 2007, Mr. Churchia's bonus income was eliminated due to a near 50% decrease in his sales volume as compared with his 2006 sales. Despite the cut, EMI's then-president, Tony Andraitis ("Mr. Andraitis"), indicated that EMI would consider increasing Mr. Churchia's base salary if his sales volume increased significantly. On October 5, 2007, Mr. Churchia filed the underlying motion to modify spousal support.
 {¶ 4} Once Mr. Churchia's bonus was cut, a series of correspondences ensued between him and Mr. Andraitis. In October of 2007, Mr. Andraitis expressed his concern about Mr. Churchia's lagging sales volume and urged him to engage in more sales calls to increase his productivity. Mr. Churchia acknowledged his sales had lessened and advised Mr. Andraitis he would continue to "do his best day in and day out." Through the end of 2007, Mr. Churchia remained below his sales volume from the previous year. Notwithstanding Mr. Andraitis' recommendation to increase his sales calls, Mr. Churchia's call volume decreased.
 {¶ 5} At the beginning of 2008, Mr. Andraitis stepped down as president of EMI and was succeeded by his son, James Andraitis. In January of 2008, the new president placed Mr. Churchia on probation as a result of his decreased 2007 sales and failure to address Mr. Andraitis' recommendations relating to increasing his sales call volume. As *Page 3 
a condition of his probationary status, Mr. Churchia was required to submit daily activity reports to the new president.
 {¶ 6} On February 4, 2008, Mr. Churchia met with James Andraitis. During their meeting, Mr. Churchia questioned the basis for his probation and why he, and no other regional sales managers, was required to provide daily reports. Mr. Churchia underscored that, in his estimation, he had an agreement with the former president that he would continue working "to the best of his ability." However, Mr. Churchia felt his probationary status and the constraints he was now under indicated the corporation and/or the new president had no confidence in him. According to James Andraitis, the meeting concluded with Mr. Churchia refusing to submit daily activity reports. Later that day, James Andraitis terminated Mr. Churchia's employment with EMI.
 {¶ 7} After a hearing on the motion for spousal support modification, the magistrate concluded there was adequate evidence to show a change of circumstances justifying a modification of spousal support. The magistrate observed that Mr. Churchia had been an employee of EMI for 33 years. While Mr. Churchia's sales were down in 2007, the magistrate pointed out that his region was smaller than other regions and, the evidence demonstrated, the drop in sales may have been a function of two major EMI accounts in his region closing and relocating. Moreover, the magistrate underscored that during the previous two years of his employment, Mr. Churchia's sales were higher than ever before. Although Mr. Churchia questioned the directives of his superiors, the magistrate gave credence to Mr. Churchia's hypothesis that he was terminated as a result "of corporate politics, family issues, and a transition between presidents of the *Page 4 
corporation." The magistrate also pointed out that Mr. Churchia was currently seeking new employment.
 {¶ 8} In light of these findings, the magistrate concluded, pursuant to R.C. 3105.18(F), Mr. Churchia suffered an involuntary decrease in his salary and bonuses as a result of his termination. The magistrate accordingly suspended all spousal support but retained jurisdiction over the matter. Ms. Churchia subsequently filed objections to the magistrate's decision. On June 6, 2008, the trial court overruled the objections and adopted the magistrate's decision.
 {¶ 9} Ms. Churchia now appeals and assigns the following error for our consideration:
 {¶ 10} "The trial court erred when it held that the appellee's termination from his employment was involuntary and that appellee was entitled to a suspension of his spousal support obligation."
 {¶ 11} A trial court's decision to adopt, reject, or modify a magistrate's decision will not be reversed absent an abuse of discretion. Bandish v. Bandish, 11th Dist. No. 2002-G-2489,2004-Ohio-3544, at ¶ 13. An abuse of discretion is more than an error of law or judgment; it implies the court, in rendering its decision, harbored an unreasonable, arbitrary or unconscionable attitude.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. The term is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record. See, e.g., State v. Ferranto (1925),112 Ohio St. 667, 676-678. A reviewing court should afford every reasonable presumption in favor of the trial court's judgment and findings of fact.Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. *Page 5 
 {¶ 12} According to R.C. 3105.18(E), a trial court may not modify an award of spousal support in a divorce decree unless the circumstances of either party have changed and the decree of divorce specifically contains a jurisdictional reservation authorizing the modification. SeeWantz v. Wantz (Mar. 23, 2001), 11th Dist. No. 99-G-2258, 2001 Ohio App. LEXIS 1386, at 5. A change in circumstances is defined as, but is not limited to, "any increase or involuntary decrease in the party's wages, salary, bonuses, living expenses, or medical expenses." R.C. 3105.18(F).
 {¶ 13} Once a court has determined a change of circumstances exists, the moving party still bears the burden of demonstrating the current support award is no longer appropriate and reasonable. See R.C. 3105.18(C); Reveal v. Reveal, 154 Ohio App.3d 758, 2003-Ohio-5335, at ¶ 14. In deciding whether the movant has met his or her burden, the court "`re-examines the existing award in light of the changed circumstances.'" Buchal v. Buchal, 11th Dist. No. 2005-L-095,2006-Ohio-3879, at ¶ 9, quoting Gallo v. Gallo, 11th Dist. No. 2004-L-193, 2006-Ohio-873, at ¶ 17.
 {¶ 14} With respect to the first prong of the statutory analysis, it is undisputed the trial court reserved jurisdiction over the issue of spousal support. Thus, the only issue for our consideration is whether the trial court abused its discretion in adopting the magistrate's conclusion on whether a change of circumstances occurred, i.e., whether Mr. Churchia was involuntarily terminated thereby creating a decrease in his wages.
 {¶ 15} At the hearing on the modification, various e-mail correspondences were entered into evidence detailing the respective differences between Mr. Churchia and his superiors at EMI. These exhibits, in conjunction with the testimony evidence, provide a *Page 6 
context for the situation which prompted Mr. Churchia's motion as well as an objective framework for analyzing the nature of his termination.
 {¶ 16} On October 5, 2007, Mr. Andraitis contacted Mr. Churchia regarding his lagging sales. Even though the evidence indicated Mr. Churchia's sales region was appreciably smaller than the other regions, Mr. Andraitis pointed out that Mr. Churchia's total sales were significantly lower than all other regional sales managers. Mr. Andraitis expressed additional concern that over a 9 week period in the summer of 2007, Mr. Churchia had made only 11 days of sales calls "or 1.2 days of sales calls per week over these two months." In this communication, Mr. Andraitis requested Mr. Churchia to "come up with suggestions and hopefully a solution on what we do next because this can't keep going on."
 {¶ 17} On October 12, 2007, Mr. Churchia responded reflecting his desire to personally meet with Mr. Andraitis regarding their "present business relationship and the future of [their] business relationship." Mr. Churchia further stated:
 {¶ 18} "* * * I also want you to know that I on any given day for thirty three plus years have always and continually given my heart and soul into the continued growth of this company. (Sic) I have done so no matter what territory or position I have had. Whether I have made one sales call a day or five sales calls a day is irrelevant in my mind.
 {¶ 19} "It is absolutely true that my sales numbers are down for months in 2007. No other person can know how many things I do for EMI every single day without acknowledgement by anybody including yourself. I have nothing to hide or be ashamed of for this entire time." *Page 7 
 {¶ 20} Mr. Churchia concluded his missive reiterating his desire for a face-to-face meeting with Mr. Andraitis.
 {¶ 21} On October 15, 2007, Mr. Andraitis replied to Mr. Churchia's message essentially recapitulating his former request for Mr. Churchia to respond to the concerns set forth in his October 5, 2007 e-mail. Mr. Andraitis stated the issues as follows:
 {¶ 22} "1. Your annual salary being $60,000 plus the benefits needs to produce a minimum of $1,000,000 of gross sales with a product mix that is in line with our companies product mix. It's your job to make this happen.
 {¶ 23} "2. If we can't see the million annual sales volume coming from your territory during 2008 I will have to make some restructuring of your territory. The job of having one salesperson in the current geographic territory may be eliminated.
 {¶ 24} "3. After you respond to the specific business issues in my October 5th e-mail we will then talk one on one to refine the business plan and talk about anything you want."
 {¶ 25} Mr. Andraitis concluded he was "looking forward to receiving any solutions and suggestions that [Mr. Churchia had] in mind."
 {¶ 26} On October 19, 2007, Mr. Churchia responded by detailing his lengthy history and personal relationship with Mr. Andraitis. He continued:
 {¶ 27} "All this being acknowledged does not change the fact that I specifically asked you for a man to man (face to face) meeting regarding our business relationship. You have turned me down." He expressed his dismay with Mr. Andraitis' comparison of the sales volume of "territories that in no way compare to the territory that you assigned me." He concluded his message, stating: *Page 8 
 {¶ 28} "* * * you want to hide behind statistics and communicate with me via E mail from Florida and not address me personally. I am getting up every day and still handling things to the best of my ability.
 {¶ 29} "My plan is to do just that.
 {¶ 30} "I will get up every day and do my best.
 {¶ 31} "The ball is in your court."
 {¶ 32} On October 19, 2007, Mr. Andraitis sent the following reply:
 {¶ 33} "The last three sentences in your e-mail I take as your business plan for increasing your sales. I accept your plan.
 {¶ 34} "To confirm, your goals for 2008 are outlined in my e-mail dated 10-15-07 items 1 and 2.
 {¶ 35} "You say that I refused a face to face with you; I guess you didn't read item #3 in that same e-mail."
 {¶ 36} On January 1, 2008, Mr. Andraitis stepped down as president of EMI. His son, James Andraitis, was named as his successor. The evidence indicated that Mr. Churchia had worked relatively close with Mr. Andraitis since the inception of EMI in 1974. Mr. Churchia had known James Andraitis since the latter was ten-years-old. Moreover, when James Andraitis started working at EMI, he worked under the supervision of Mr. Churchia. Regardless of their past personal and/or professional relationship, however, it is apparent a tension had developed between the two men by the time James succeeded his father as president of the company. *Page 9 
 {¶ 37} In a January 10, 2008 e-mail, James Andraitis pointed out that Mr. Churchia's sales were "only $732,370" (lower than all other regional managers and lower than each of Mr. Churchia's previous three years). The letter continued:
 {¶ 38} "In reviewing last year's correspondence, Tony repeatedly expressed concern and warned you about low sales and lack of sales calls.
 {¶ 39} "In October, Tony directly requested that you come up with suggestions for an action plan to improve your sales performance and productivity. You said that you `will get up every day and do [your] best.' Your response was devoid of substance to the issue at hand. Your response did not indicate any action plan, change, or improvement on your part.
 {¶ 40} "It is interesting that also in October you were explicitly told that you don't make enough sales calls. Yet in November and December you made even fewer days of sales calls. It is evident that you aren't even trying to improve your sales performance or productivity."
 {¶ 41} Mr. Churchia was ultimately placed on probation at EMI as a result of these issues. On February 4, 2008, Mr. Churchia met with James Andraitis in the latter's office. During the meeting, Mr. Churchia testified he wanted to convey to James Andraitis that, in his view, he did not under-perform in 2007, and his lower statistics could be explained by the economic downturn. Mr. Churchia pointed out that his past performance had never been criticized or a subject of concern. Mr. Churchia conceded he questioned his probationary status and James Andraitis' decision requiring him to submit daily reports when no such measure had ever been imposed on other regional *Page 10 
managers. Mr. Churchia testified that, while he was controlled in his voice and "level of conversation," he did not deny having "an attitude."
 {¶ 42} With respect to the meeting, James Andraitis testified Mr. Churchia explicitly refused to submit the daily reports and, as a result, James Andraitis sent Mr. Churchia an e-mail which stated, in relevant part:
 {¶ 43} "At about 9:20 this morning, you came into my office to (1) comment about my written response to a court ordered subpoena and (2) to tell me how you are going to do your job.
 {¶ 44} "It is the second item that is the concern of this correspondence.
 {¶ 45} "You told me that you are not going to follow my directives to you. But instead, you are going to do what you and Tony `agreed' to (Oct. 19th) and that was to `make sales calls to the best of your ability.'
 {¶ 46} "There are several problems with the statements you made to me this morning. First, your defiance to EMI's written directives to you is unacceptable for your continued employment at EMI. Second, Tony is now retired as president of EMI. You have been informed that I am now president of EMI and that you, as well as all outside salesmen, are accountable to me. Third, your stated intention to revert back to your action plan as you told Tony (Oct. 19) is a significant step backward; particularly since your sales activities decreased in the months following that. Forth [sic], from correspondence on January 14, 2008, and our follow-up meeting on January 16, your continued employment at EMI was on a probationary basis. You have not adhered to the requirements for continued employment. Fifth, this morning, you had no interest in having a cooperative discussion with me. Instead, you unilaterally told me what you are *Page 11 
going to do. Your contempt for the corrective action steps spelled out for your continued employment at EMI is not acceptable."
 {¶ 47} Mr. Churchia was subsequently terminated.
 {¶ 48} The trial court determined that Mr. Churchia's termination was "involuntary." We disagree.
 {¶ 49} Again, R.C. 3105.18(F) requires an "involuntary decrease in the party's wages, salary, bonuses, living expenses, or medical expenses." However, the evidence establishes that the decrease is the result of Mr. Churchia's voluntary acts (i.e. insubordination) or omissions. The statute does not provide for a modification because there is no "change in the circumstances" under the statute's definition.
 {¶ 50} On February 4, 2008, James Andraitis was confronted by Mr. Churchia with respect to the foregoing e-mail that requested Mr. Churchia to begin filling out sales call reports because James Andraitis wanted him to begin documenting his efforts at making sales calls. Mr. Churchia did not like this requirement and voluntarily went to James Andraitis and told him that he was not going to do as instructed. James Andraitis considered this to be a violation of his authority and company policies. According to James Andraitis, had Mr. Churchia not taken that action on February 4, 2008, he would still be employed.
 {¶ 51} The record shows that Mr. Churchia's termination was not the result of the company merely deciding that his sales were down. Rather, Mr. Churchia was fired because he told his boss that he was not going to do what he was instructed to do. Clearly, Mr. Churchia was insubordinate. His termination was the result of a voluntary act which got him fired and is the sole reason for his termination on February 4, 2008. *Page 12 
Although the dissent alleges that Mr. Churchia suffered an involuntary decrease in his wages, the facts in the record before us do not support a finding that his termination was "involuntary." Mr. Churchia's actions in unilaterally causing his termination are his own fault and created a voluntary termination. The magistrate's decision that Mr. Churchia's termination was "involuntary" and the trial court's adoption of that decision constitute an abuse of discretion.
 {¶ 52} Ms. Churchia's sole assignment of error is with merit.
 {¶ 53} For the reasons discussed in this opinion, the judgment of the Geauga County Court of Common Pleas is reversed and the matter is remanded for further proceedings consistent with this opinion. It is ordered that appellee is assessed costs herein taxed. The court finds there were reasonable grounds for this appeal.
DIANE V. GRENDELL, J., concurs,
CYNTHIA WESTCOTT RICE, J., dissents with a Dissenting Opinion.